This is our first case of the afternoon. Barbara Jackson v. Decatur Memorial. 415-0969 for the appellant, Mr. Keyhart, and Mr. Trimble, and for the appellee, Mr. St. Phil, and Mr. Faber. And I note who's arguing. Thank you. You may proceed. May it please the court and counsel, I'm Mike Keyhart. I'm representing Dr. Stephen Weber, a surgeon from Decatur, as well as Decatur Memorial Hospital, his employer. This case arises out of surgery for rectal prolapse in August of 2012 by Dr. Weber, who's an employee of the hospital. He did a procedure called a low anterior resection, which basically involves treating by removing the rectum in large part and then connecting the large intestine with the rectum. The claim in this case is that he was negligent in the sort of surgery he did, the technique he used. The plaintiff underwent a colostomy approximately 15 months after our surgery, and because she was incontinent. The verdict in the case was returned in June of 2015 in the amount of about $2.89 million, of which $1,750,000 was for non-economic damages and $1 million was for past and future medical bills in the case. There was also an award for $147,000 for lost income, $37,000 past, $37,000 and $110,000 in the future, two years. The medical bills in this case aggregated about 230 pages. The total bills were approximately $590,000, and there were a number of procedures that Ms. Jackson underwent over the years. She had our surgery in August of 2012. She had a fluid accumulation just a few days later at Decatur Memorial Hospital. She had then a gallbladder surgery in mid-September of 2012. She had an intestinal obstruction in December of 2012. She had her colostomy in late 2013, and in 2014 she had a case of pneumonia, I believe late October of 2014, and two intestinal obstructions caused by adhesions in 2014. We appealed in this case the denial of our motion for judgment notwithstanding the verdict and our denial of our motion for new trial and our motion for re-editor. The basic difference between the technique which the plaintiff claims we should have done and what we did is that with the technique that the plaintiff believes we should have done, you basically preserve the rectum and then you tack the upper part of the rectum to the spinal column so that it remains in place and then make your cut from the intestines further up in the patient's body. The plaintiff's experts in this case are both surgeons who began their career after 2000, both young surgeons. Dr. Thiele from Springfield who did his training here in Springfield and also St. Louis, and also Dr. Mueller who did all of his training at Northwestern. Dr. Mueller does not do rectal prolapse surgery. He has done, I think, twice under emergency circumstances. The plaintiff in this case basically contends that it was a departure from the standard of care for my client to do this surgery, removing most of the rectum, and the claim is that we should have instead done the rectopexy. The plaintiff's two young surgeons who are her experts, both were of that view. The problem we have here is that there are literally many hundreds of training programs for surgeons around the country. I have no doubt that Dr. Thiele and Dr. Mueller are fine surgeons and they know what they know as a result of their training and I think that's the way they were trained exactly, but it is the fact that many people are trained otherwise. For example, we had an expert from the colorectal surgeon from Fort Worth, Dallas area, who testified that in fact there the preferred method is low anterior resection, which is what my client did, and another expert, Dr. Adams from Colorado, who testified the same way. The events involving the plaintiff's health after our surgery is that she suffered incontinence and that began shortly after the surgery and went on into 2013. It is clear from the testimony of all of the surgeons in this case, plaintiff's experts as well as ours, that all of the different approaches, and there are some six or seven or eight different technical approaches to this, can result in incontinence. And typically when the approach is used that we used, the more dramatic surgery, the patient remains continent. That's true of the plaintiff's experts in the case who testified that generally they are. My client has done approximately 15 to 20 surgeries of this sort and has never had a patient suffer incontinence other than in this particular instance. There are other factors that affect incontinence. Sphincter tone of the patient, squeeze pressure strength of the patient, the history of gallbladder surgery, all of these things are factors that go into it. The sum total of the intestinal obstruction charges for this lady were $222,000. Dr. Thiele is of the view and clearly testified that it didn't depend upon the sort of surgery which our client performed, which is to say his technique that led to the incontinence. He says surgery is surgery. Once you insult the body, once you do surgery and you make the incision into the patient, and I imagine your honors have had this from time to time in cases, there are adhesions that form in everyone. And they develop in varying degrees depending on the patient, but they develop those things. Dr. Thiele in this case says that those adhesions this lady developed were not the result of anything they claim in this case that we did wrong. Dr. Mueller testifies truthfully that there's no way to know which surgery that this lady had, and there were many, produced which adhesion which this lady might have developed, which produced the obstruction. The point is that I believe both the plaintiff's experts as well as ours have testified that no negligent act of our part that we're charged with caused these intestinal obstructions. It's rather the insult to the body. Plaintiff developed pneumonia. It appears likely it's a type of pneumonia that you get from being in the hospital. The charges for that were about $84,000. The fluid accumulation I think that nobody connects with any wrongdoing on our part was I think approximately $32,000. So a substantial part of these medical bills that were awarded, well, that were claimed in the case, that were put in evidence, $590,000 were things which we think under the uncontradicted evidence were not responsible for. So the jury returned a verdict of $1 million. It was not broken down. It was, I think, past and future medical expense. That follows the IPI recommended form. That's what we used. The plaintiff suggests that in order that we have somehow waived this argument because we didn't ask for a verdict form which would have split past medical bills apart from future medical bills. We know at the most past medical bills would have been $597,000, and if the jury did that, then it means they gave awards for medical expenses that we did not cause, and we think they're excessive. There's a claim in this case also for lost income. We believe the uncontradicted testimony is that Mrs. Jackson, fortunately, can work, could work. She was unable to find a job, but she's fully employable in her position. She was a skilled person who worked at a jewelry store, their indicator. There was a total of, I think, $147,000 awarded for that. Let me back up a minute. Yes. Two questions. One, if the theory at trial and the evidence showed from your perspective that these medical expenses did not result from the original insult, why go with a general verdict? Well, there wasn't a general verdict. Why go with a verdict that didn't itemize or that there were no special interrogatories? There was no way to determine after the fact what the jury had decided. Well, the verdict form was tendered by the plaintiff. We did not object to it because it is IPI, and I will say she cites two cases which she says results in our having waived this. Those cases do not stand for that proposition. All right. And also we did object specifically on the grounds that we're now saying, which is many of these bills are not things that under any interpretation of the evidence we caused. So we believe that we should get relief in the form of either a new trial, if the court would choose to do that, or an order of remittiture. Now, the second question relates to the connection between these events. You said surgery, surgery and insult to the body. But what if the insult to the body is the wrong insult, i.e., are there things that flow from, you don't concede that it was the wrong surgery, but if it was the wrong surgery, is it more likely true than not that some of these things would have followed the more, and I don't know that it's accurate to say that what your client did was more, is it accurate to say it was more severe or more invasive or more of an insult to the body than the other procedure would have been? Well, it certainly removed more of the rectum. It certainly did that. But the answer is we just don't know which of these surgeries, and there's no way to know which of these surgeries she had. She had a surgery when she was a teenager. While it seems kind of a stretch, the doctors all say that could be the culprit in this case. It could have been our surgery that we did. It could have been the surgery on the intestinal obstruction in December. It could have been any of these, and there's no way the plaintiff's experts will say that we can know which it is. So they didn't really connect that. We did object to these precisely on this ground. I noticed the plaintiff's side of the case of Snelson v. Kahn. I was in that case. I defended Dr. Kahn. And she seems to cite that as a basis for saying that under the circumstances, you must object twice to medical bills, both when they're offered and then when you discuss whether they go back to the jury or not. I do not believe Kahn v. Snelson stands for that proposition. The facts of that case are different. It was a situation where we knew that there would be further proceedings before the judge outside the presence of the jury to discuss that. And in the rush to get to the jury, we simply didn't do it. That's not the case here. We were very detailed with Judge Little in going through these medical bills. There's also a suggestion by the plaintiff under the Borowski case that she cites, that somehow the plaintiff doesn't need to prove each and every element of damage that she claims in the case. She raised Borowski in a limine motion before Judge Little but chose not to argue it. She abandoned it before the court. And the reason is because under Borowski and also under the case that followed Holton, it's clear that you must prove if you're a plaintiff each and every element of damage that you claim in the case. And she simply can't for some of these injuries. The other point that we have is that an intestinal obstruction is not reasonably foreseeable to our client as a result of the surgery we did. That neither the incontinence nor the intestinal obstructions were reasonably foreseeable to us. The other major ground that we raise here is certain things the plaintiff's attorney did during the course of this trial. There seems to be a tendency anymore for plaintiff's lawyers to try to inject into medical negligence cases the concept of safety rules. The plaintiff's lawyer in this case talked about rules. And we objected the first time she ever did it. She was making the opening statement. We have a sidebar with Judge Little. And the question was asked, well, where did that come from? And she said, from right up here. In other words, she came up with it. She raised it. Our objection was sustained seven more times than opening statement. She said rules, that rules govern the conduct of doctors, and they don't. And she also said those rules are found in medical literature, which it isn't. Medical literature doesn't serve any purpose. What if she had used the word standards? Well, standards, I think, would have been okay under the circumstances, I think. Rules, to me, connotes a much more specific requirement that you adhere to. But standards are pretty amorphous. I mean, doctors can do this surgery any one of several ways, and the literature doesn't really say you can't do it this way and must do it this way. And you think the jury would pick up on that? I don't know whether they did or not. But let me tell you, we'd objected. Then within just a moment or two later, again, we'd hear rules. And then we'd object, and that would be sustained, and they'd say it again a few minutes later. They certainly pounded it hard enough. I have to think it would have had some effect, and she was doing it for some reason. I don't think rules apply. It's almost like the old days when we had the scaffolding case where every other word was safety. That's what you heard. Medical negligence isn't like that. Standard of care is the issue. Causation is an issue. But safety rules are not. The other thing the plaintiff did was, with respect to one of our experts, is that she impeached him, and we did file a limiting motion, and I'm mindful that that doesn't affect our interest in this case. But she spent a long time impeaching him with other instances and other cases where his testimony was disallowed. But the unfortunate thing for the plaintiff is that they didn't follow up. They didn't complete it. So we don't know. We had just a litany of cases where, for one reason or another, his testimony was not allowed. We don't know what the subject matter was. We don't know what the test was in that jurisdiction. That's what our limiting motion went to. But yet she went on and she did that with this particular witness. She also, in her closing argument, says, look how far the defendant had to go. They must be at fault because they had to go all the way to the boondocks. They had to go all the way to Texas to find a 70-year-old surgeon who would say what they wanted him to say. Well, as we point out, I think there are four judges on our Illinois Supreme Court who maybe wouldn't qualify if 70 is the decider. I shouldn't be here if 70 is a problem. Me either. Yeah. So there was also a suggestion along the way that for doing this procedure that our client got a bigger fee for doing this procedure as opposed to the way the plaintiff suggests. The truth is she didn't prove that in the case, but she did argue that as well, and that's improper. Certainly the financial interest of a witness is relevant to a witness, but it is not relevant to the conduct of a doctor. She also pointed out that we did not bring literature into court, and there's no requirement that we do that. I don't recall that I've ever done that in a medical negligence case that I've had. We also raise to the court, and I'm mindful of the court recently in Miller v. Sarah Bush Lincoln. This is on the 1205 post-trial motion. I'm mindful of what the court did. It is contrary to the position we urge in this case, but the court has ruled what it did, and so I think I know the answer to this, but we have raised that we think we should be entitled to the write-off, so to speak, and I think that was directly addressed in the Miller case, that we should have credit against the judgment in the event we don't get other relief that we're asking the court for. So to the extent I haven't argued anything specifically, I don't weigh those points, but in large part this is the argument we have. I might say there are four specific claims of negligence in this case. Three of them the plaintiff didn't connect at all with injury. There was simply no testimony that caused injury. The one, and she basically admits this in her brief, the one that she does have some evidence on is that we chose this procedure, the low anterior resection, rather than the rectopexy. She does claim that, and there was testimony from people that they thought that was improper and caused injury insofar as the patient then underwent, developed incontinence and underwent further surgery. So we believe under these circumstances. It's clear to us. I don't know if the jury gave $590,000 for medical bills or not, past and future. We don't know on future medical bills. We don't know whether this lady is ever again going to develop intestinal obstructions. We can't know that. No doctor said that. No doctor can predict it. The other... I want to go back to that. They offered the instruction. You did not object to the instruction. How do you get itemization? How do you get some understanding of, if you know that's going to be an issue, and it's an issue that you think cuts in your favor, don't you have to offer an instruction or offer a means by which to get to that itemization? Well, let me just say, I'm smarter now, and I would sure do it if I have this again, but I don't think the law required me to do it. I think the IPI was satisfactory, but in reality, yes, I wish we had that. We know it can't be more than $590,000, which means they allocated $400,000 to what may or may not happen in the future. It could be as little as $250,000 they gave this lady for medical bills, which leaves $750,000 for the future. We don't know. But it's something that we can't know is going to happen. So we believe this is the case particularly. I know there's a tendency to say, well, you've had your trial. You wanted a trial, you got it. And you put on the evidence you wanted, and it went in pretty much the way you want. But in this particular case, I think there's no way with this verdict, itemized as it was, to uphold it. And we think we should have relief. Thank you, Counsel. We'll hear from you on rebuttal. Thank you, Your Honors. I'm Alex DeSanto, and I represent the plaintiff in this case. Your Honors, you are correct. There is a statute which requires counsel to itemize a verdict. That's Section 2-1109 of the Civil Practice Code. That requires that verdict forms be itemized. And the Marcheski case, which I cited in my brief, says that if counsel does not itemize the verdict form, then they cannot bring up any individual items of damages. It's forfeited. And that's clearly set forth in the Marcheski case. I put that in my brief, and defense counsel did not respond to it at all in their reply brief. But clearly, Marcheski, that case, and Section 2-1109 require that a verdict form be itemized. And if you don't itemize it, you lose if you want to calculate specific items of damages. By the same token, I would have lost too if I were challenging the inadequacy of damages, because both parties have to do it. I didn't do it. They didn't do it. They didn't object to the verdict form. And so there is a forfeiture there. The outcome of this case is controlled by the standard of review. Defense counsel did not mention the standard of review. The standard of review is the Pedrick standard on judgment and OB. And the Pedrick standard, we all know, says that when all of the evidence viewed in the light most favorable to the opposing party, so overwhelmingly favors movement, that no contrary verdict based on that evidence could ever stand. Clearly, the overwhelming weight of the evidence in this case is not in favor of the defendant. Another version of the standard of review was the Supreme Court in the York case, which said a total failure or lack of evidence to prove any necessary element of the plaintiff's case. It's a very high standard. In their brief, defense counsel acknowledged that it is rarely granted. And in this case, there simply was not proof. The main issues that the defense counsel raised in their reply brief was their contention that we did not show evidence of a standard of care and that incontinence was not foreseeable as a result of removal of the rectum. But, Your Honor, there was abundant evidence, both from Dr. Thiele, who is a treating physician, and also from Dr. Kyle Mueller. At page 1003, I asked Dr. Thiele this question. Doctor, is it contrary to the standard of care to remove almost all of the rectum for a rectal prolapse in a patient like Barbara Jackson? He answered, well, a procedure like this cures the prolapse, absolutely, but it typically results in incontinence. So, if the goal of the patient is to fix the prolapse but also remain continent, then the rectopexy is the standard of care. Now, that question furnishes both the answer to standard of care as well as evidence of foreseeability. Dr. Thiele also testified that doing the rectopexy was the gold standard. What is the gold standard? You look at Webster's online dictionary of what gold standard means. One definition is benchmark. Interpreted in a light most favorable to the plaintiff, as it must be on judgment NOV, that means standard of care. Or, what standard of care means, what reasonably careful doctors do in the same or similar circumstances. One other example, question, this is at page 1042. But, for example, Mrs. Jackson, anything other than a rectopexy would have been below the standard of care? Answer, she is desiring the best functional outcome possible, so then I think yes. Now, Dr. Thiele also said, yes, it is his practice to do a rectopexy. But, unlike the case which they relied on, Walsh v. Tiesinger, in that case the expert testified not only just what his personal practice was, but he affirmatively stated that he could not testify as to what the practice was generally. He said, I'm only familiar with what is available in my own institution. Contrast that with Dr. Thiele's testimony. Dr. Thiele at page 994 said this, question, does the training in colorectal surgery, the basic standards of doing a low anterior reception or a rectopexy, does that vary from place to place? Answer, as far as I know from talking with other colorectal surgeons and being a part of a training program, it is pretty standard. There is a core set of things that we are required to teach every colorectal fellow, and they are the same universally throughout the country in all the colorectal training programs. You can't get much more basic than that as far as standard of care testimony. Plain as other experts, Dr. Mueller testified as to the standard of care. He said, oh, Dr. Thiele also said that doing the rectopexy was the wrong operation. Again, that implies standard of care testimony. Dr. Mueller said, what? You said the rectopexy was the wrong standard of care. Oh, I'm sorry. What I said is Dr. Thiele said the low anterior reception. Yeah, the question was, question, would it be fair to say that doing the low anterior reception plus the removal of the splenic attachments was the wrong operation? Answer, I think that it was. That's the exact quote of what he said. A wrong operation, when you take that in the light most favorable, obviously means a violation of the standard of care. Dr. Mueller also said, I asked him a question about his written report, and I said, did you conclude, in my professional opinion, Dr. Weber deviated from the standard of care by not performing a rectopexy, and also by resecting the majority of Mrs. Jackson's rectum? And Dr. Mueller answered, yes, that is what I wrote, and I agree with that. Now, contentions that Mr. Keyhart says that, well, Dr. Mueller didn't have that much experience, that goes to wait. That was decided in Snelson versus Pan, and that was decided in the Heminger versus LeMay case. If an expert doesn't have much experience, that's fine. That's something the jury can take into account, but ultimately it's a jury question. With regard to foreseeability, that argument really floors me, because Dr. Thiele's own office note that he wrote in the ordinary course of business, the first time he saw Mrs. Jackson as a patient, and he wrote, I have no idea why a low anterior resection would have been performed. I am sure this, in large part, explains her incontinence, as she has no more rectal reservoir. At trial, Dr. Thiele went on to explain what the function of the rectum is. The function of the rectum is a storage vessel, and it is unique because of the fact that he said, he testified at page 1002, that the rectum sends out progressive warning signals as it begins to fill. At first, you only feel a slight urgency, but as it fills more and more, it becomes obvious to you, you need to get to the bathroom. On the other hand, Dr. Thiele pointed out that the colon is just a conduit. It takes material from point A to point B, so there is no warning sign. Consequently, you have the incontinence. Dr. Mueller also testified that the practice parameters indicated that anterior resection may cause complete loss of control. Again, that is an indication that if you take out the rectum, problems may occur. That is certainly some evidence of foreseeability. The fact that not everyone becomes incontinent after having a low anterior resection is irrelevant. Plaintiff is not obligated to prove that the foreseeable outcome occurs in every case. I mean, that's like saying that a collision is not a foreseeable result of driving too fast, because not everyone who goes over the speed limit gets into an accident. In Marshall v. Berger, the Supreme Court said it was foreseeable that an out-of-control car would hit a plate glass window. Certainly that doesn't happen every day. With regard to damages, they argued in their reply brief, we had to show that every aspect was foreseeable. No, they have no authority. Once we show that some injury might occur, we don't have to show that every consequence the plaintiff experiences is going to be foreseeable. And that was, again, Marshall v. Berger, King and Naur-Hayes. Defendants find no authority saying that that is what the rule of law is. Also, there was abundant evidence that bowel obstructions might occur from surgery. And with regard to their suggestion that plaintiffs did not have evidence that the bowel obstructions were related to what Dr. Weber did, is simply incorrect. You only have to look at Dr. Mueller's testimony at page 1381 of the record, where he said, I asked this question. I said, doctor, the next surgery that Barbara Jackson had was on December 6th of 2012. Do you have an opinion to a reasonable degree of medical certainty as to whether the extensive surgery that Dr. Weber did on August 27th contributed to the development of the bowel obstruction? Answer. My opinion is that the surgery that Dr. Bailey had to do was more than likely related to the previous surgery that Dr. Weber did because he went so low into the rectum area to divide that area that creates even more scar tissue. The reason, to my medical opinion, I can say is that Dr. Bailey's operative report clearly describes that's where all the adhesions he had to deal with there. They were all down low in the pelvic area where that rectum had been divided. That's precisely what I think, Justice Connett, you were asking about. That, in fact, there was testimony there hooking up that thing. Now, later on, Dr. Thiele did surgery to have the colostomy, and then she developed complications, so she had to have more surgery. Down the road, when she had more bowel obstructions, the doctors said, well, I'm not sure which one, i.e., whether it was Dr. Weber's surgery or Dr. Bailey's surgery in 2012 or Dr. Thiele's first surgery in 2013 or Dr. Thiele's second surgery in 2013, because at that point in time, Dr. Weber got this whole series started. If he hadn't done that extensive surgery removing her rectum, she wouldn't have had the bowel obstruction in 2012. She wouldn't have had the surgery in 2013 to do the colostomy. So that's what led to all the later bowel obstructions. But it never would have started if it hadn't been for Dr. Weber getting the train started. With regard to manifest weight of the evidence, again, the standard of review is important. Not only can a verdict not be reversed for manifest weight unless the jury's findings were unreasonable, arbitrary, and not based upon any of the evidence, this court would also have to find that Judge Little abused his discretion in denying the motion. With regard to the issues of trial error, every single instance, just about every single instance of trial error that defense counsel has raised in this point was forfeited. They never objected. They simply did not object. They didn't object to issues of Dr. Adams' supposedly incomplete impeachment. They didn't object to the fact that I mentioned that Dr. Carl Adams is from California. They didn't object to the fact that I mentioned there was a possible issue of financial interest. There was simply no objection. And the Vanderhoof case makes it clear, if a party urges an error on appeal, which is not raised below, that is tantamount to raising plain error. And under the plain error doctrine, this court indicated in Fakes v. Eloy, that it should be applied exceedingly rare and only where there is an affront to the judicial process. None of the errors that Mr. Keyhart has brought up were an affront to the judicial process, or they weren't, as this court also said in Fakes v. Eloy, a blatant mischaracterization of fact, character assassination, or base appeals to emotion and prejudice. It's not there. The other thing about reversible error is reversible error only occurs if the defendant meets the burden of showing it was substantially prejudicial and would have affected the outcome of the case. That's Simons v. Garces, the Supreme Court case. None of the errors they've led here get to that. As far as to the specific complaints that they raised in their reply brief, like this rules of practice, this is what I said in opening statement. I said this at 932. There are no laws which define what a doctor must do in a given situation. Instead, there are standards of care. Standards of care are defined as what reasonably careful doctors do in similar situations. Now, this concept of the reasonably careful doctor may sound murky, but the basic rules of surgical practice are well known, and they are set forth in the practice parameters that give direction to doctors, and they are defined in the procedures that reasonably careful doctors perform for treatment of erectile prolapse. So, right there, I defined what rules were. They're standards of care. And in each instance, I mentioned the rules or whatever. There was either a sustained objection or no objection. A sustained objection cures any prejudice. That was set forth in the Simons v. Garces case. And if they didn't mention it, they didn't bring it up, then they forfeited. It's not plain error. And the defendants haven't shown how that mention of rules, because every time I mentioned it, it was always rules corrected, standards of care. And then, of course, at the end of the trial, the judge instructs the jury on what the standard of care is. With regard to improper impeachment of Dr. Adams, they never raised it. And this court, in the Morris v. Milby case, said an objection is required. The defendants tried to cite a case, a Hackett case, but in that case, the defense counsel blatantly mischaracterized the expert's testimony and, in effect, testified himself that the expert was lying about his testimony. Nothing like that happened here. And there was simply no objection. It's a forfeiture. Financial motive, again, no objection. And, in fact, the case law is that you can bring it up. Now, with regard to the 2-1205 issue, I think that, indeed, this court's opinion in the Miller v. Sarah Bush Lincoln case is dispositive of the issue because of the fact, well, there are two aspects to the medical bills. There is approximately $404,000 that was paid by Blue Cross Blue Shield, and there's $191,000 of write-offs. And in the Miller case, this court said and held that because the write-offs were not paid by anyone and only allows a reduction for benefits that were either paid by an insurer or are payable to the plaintiff, that, in fact, there can be no reduction. Conclude your thought. What? Time's expired. Okay, thank you. You can finish the thought. Oh, okay. Sorry. But, in any event, Miller determines that. I also think they did not timely file their application for the benefits because of the fact that there's no language in 1205 that allows for an extension of time. And a court has no leeway to grant an extension for what is, in essence, a statute of limitations. Thank you. Thank you. Rebuttal. Yes. Responding, Judge. If counsel is relying upon the Morjesky case on the issue of whether past and future medical bills must be separated out, she loses. The case does not stand for that proposition. No case I have seen, none that she cited, says you must separate past and future. She cites one case, in fact, that has the old general verdict form with absolutely no itemization at all. I realize if I come in here, and as I listen to her, I guess it's more apparent to me. If we come in here and say, well, our experts are good and they said this, and she comes in and says, well, I have two experts and they're good and they say this, we lose with nothing more. But there is something very basic here. These are young surgeons here, and I have no doubt they fervently believe in this procedure they were taught. In this trial, counsel brought up the fact that the former head of the SIU, School of Medicine here, moved to Dallas-Fort Worth, where my expert, Dr. Jacobson, is from. And there are 70 to 75 colorectal surgeons in Dallas-Fort Worth. Overwhelmingly, they prefer the procedure. My client did. Counsel seemed to be pleased that she was bringing that up, saying, well, you know, it can't be that obvious, because someone who teaches my method is now in Dallas-Fort Worth. But it was clear, and there was testimony on this. Those surgeons said, that's not the way we do it. I think there are regional differences. I think there are differences in terms of when you were trained. They have two young surgeons here. We have two with vast experience in the case. You can't explain away the fact that there's an entire committee like Dallas-Fort Worth. There are people who believe in this and do it, and there are people who trained in it all over the country and do it. These two young surgeons cannot know what's taught at every single one of these hundreds and hundreds of medical centers around the country. They can't know it. Counsel argues, she says, well, there is proof that this particular incident was related to our surgery. In point of fact, I bet she wishes her surgeons had said that, her experts, but they didn't. They said specifically, we don't know what surgical procedure was that led to this. Nobody says that it was our surgery, and they need to prove that in order to prevail on this. On the financial interest question, when she asked about the cost of the procedure, I did object during the trial. I objected to some of those efforts she made on a failure to complete the impeachment of these people. I think there is enough here that with these damages of a million dollars for this that her own experts say are not related to anything we did wrong, that the verdict was vastly excessive, I think it was, and I think we should get a new trial at least, at the very least. And I think that that would do substantial justice if the court does that. I think she failed to prove, to uphold the verdict that there was in this case. I think that the proof of lost income wasn't proven, and I think the vast amount of these medical bills wasn't proven. So we think there should be relief given to us in this case, and we would hope for a new trial. Thank you, counsel. We will take this matter under advisement and recess for the next case.